Do you want to reserve seven? Yes, your honor. May it please the court, my name is Greg Distant and I am representing the appellant Janssen. We appeal the district court's decision granting summary judgment on grounds of ensnarement. And basically one problem runs through the district court's decision from top to bottom. At page 44 of the blue brief, you say the court admitted there was no reason other than hindsight to focus on the differences. Where did the district court admit? I just want to find the sentence, excuse me. Where did the district court admit something? I know when courts admitted things they let them into the record. I'm sorry about the language, your honor. Oh, but it is the language. But the admission or the statement from district court is where it said that... You missed my point. You mean the holding by the district court. I do. It is the holding of the district court that... The district court is not your opponent. I understand that, your honor. I apologize for the language. I just did that as I thought. But the district court said that it's not impermissible use of hindsight to analyze the differences between the claim composition and the composition of the prior art that was directed to the same problem. And this is the second point I'll get to, if I will in a moment. Well, if you get a chance. At joint appendix 2240. Hold on one moment. Sure. I'm going to read it for you. The district court stated, quote, I don't think that the field patent, that it's proper to rely on it. And I don't suggest there's any improper motive, but... And then he goes on. If the field patent was that great for you, you would have put it in the brief. On page 47 of the red brief, Celtrion says that when the district court noted felt was not in your briefs, you responded, and it's in the record, you can disregard it, judge. How has the district court demonstrated can you then possibly rely on felt in good faith after saying you can disregard it, judge? The reason was because the district court did something that was not something the parties were arguing about, but then on page 102 of the appendix, the court purported to review other references in the prior art. And it then reviewed a few references in the prior art, ignoring the field patent, even though the field patent was one of the references that Dr. Glack and their expert relied upon in the underlying source material. And so it seemed to me unfair, incorrect. For him to disregard it. It seemed to me if the district court chose to make findings about what the art as a whole reflected, that this was an incomplete discussion. It was unfair of him to disregard it is what you're saying. I think it was incorrect of him to disregard it. Incorrect, even though you said, quote, you can disregard it. I did for purposes of our affirmative argument, but then the district court, in my view, and you may disagree, I assume you do. Thank you. The district court continued to discuss the entirety of the prior art. Had he not done that, I don't think there would have been a basis for me to raise the field. Can I ask you about it? On the assumption that the district court said some incorrect things about the absence of any need for the obviousness case embedded in the experiment thing to establish some reason for a particular starting point. Why is that prejudicial here? Why can't the district court, even on summary judgment, be sustained because the evidence supplied that reason without there being a tribal issue of fact? Well, the evidence, and I apologize, but I didn't quite get which motivation you're talking about. You're talking about the entirety of it. Because the evidence on summary judgment should be looked at in the light most favorable to us. Okay, so the particular form of the question is, what evidence creates a tribal issue of fact on either the starting point or, more importantly, the set of overall factual questions whose answers go a long way toward determining obviousness? First, on the selection of the media, the starting point, there is the testimony of their expert, Dr. Glackin, at appendix 1094. And it says, you start, starting point are the classics, the commercial media, and they are not complete serum-free media, which is what they're relying upon. So looking, viewing that evidence in the light most favorable to us, you don't start where they start with GSK or life tests. Did he go beyond saying that as an ordinary matter, somebody would start with, I think he called it the basal media? That is what he said. Our expert said you wouldn't start there at all. He said, yes, as an ordinary matter, you wouldn't start there. Our argument is, in the light most favorable to us, you wouldn't start there. And that's not a good, that's not where an artisan would start. And that's supported by more general evidence about the extraordinary amount of experimentation and selection and addition and subtraction of compounds that artisans go about in creating these media. So that's the first part. The second part has to do with the ingredients. So let's say you get to the GSK formula. The district court, if you don't have a, if you don't use hindsight to identify the particular ingredients that you want to modify to recreate the claim to invention, then you're looking at 80 ingredients. How do you pick where to make modifications? Again, the record shows that artisans add and subtract routinely in the course of development. You've got 80 ingredients. The judge spent 14 pages talking about motivation. The entirety of that discussion was general. That is, one has a general motivation to improve. If you look at that, that doesn't lead you except with hindsight to FAC. If you look at that, it leads you to an infinite number of choices. So that's... Is that a legal argument or a factual argument? It has two components. The legal argument is you should not use hindsight to select among 80 ingredients. And that you can't just look at the differences, I guess. And you can't, yeah. I think the judge misapplied Graham. I mean, Graham says, of course, you must identify the differences. But based on this Court's longstanding case law, after you've identified the scope of the art and the differences and the like, then you do the obvious analysis. And that requires setting hindsight to the side and looking at the art without hindsight to see if there's a motivation to modify the art to arrive at a compound, you know, that eliminates the differences and is therefore obvious or there isn't. Let's say that we don't agree that the methodology is wrong. Is there also a factual assertion? Yes, there is. The factual issue is whether FAC is or is not interchangeable. They claim it is. The district court recognized that there was a fact dispute on that. If you look at 87 of the appendix, page 66 of his opinion, it says the experts disagreed on whether FAC would have been equivalent to the iron chelates in the... But based on the testimony of Dr. Glackin... Yes, sir. ...which you cite in your brief, couldn't different forms of iron chelators deliver iron to the cells with a reasonable expectation of success? I think they could deliver some chelate with reasonable expectation of success, but not with the reasonable expectation of a successful formula that will grow cells in a desirable way. And by that I mean, let's say we can pass interchangeability. Their argument is you don't need motivation if it's interchangeable. I'll accept that for purposes of this discussion. But you do need, so then you need a reason. FAC has to be desirable. It can't be technically feasible. It has to be a desirable option. And the evidence, viewed in the right most favorable to us, is that it's not a desirable option. It's just there. Adequate. Fulton is the case I'm referring to when I use feasible versus desirable. Fulton says it's not sufficient for something to be technically feasible. Yeah, that's why I asked you the word adequate as opposed to desirable. Adequate. No, it would not be adequate for a commercial. The judge is talking about making something that creates pharmaceutical. My question, if it was adequate, would that be satisfactory? I apologize for laughing, Judge. I think adequate is a word that you could push in either direction. And I prefer to stay within the case law. It's not desirable. Our experts said it was not desirable. Their expert agreed it was inferior to the others. To remind you, you're within your rebuttal time. I am. But let me just finish this general question, which I think covers really everything I want to talk about. So to start with, we talked about the selection of the media. We talked about the ingredients. And the last error the district court made, in our view, is on concentrations. There are 80 concentrations in the prior art reference. 50 of them, approximately, are overlapping. And for many of them, the prior art preferred concentration is outside of our range. Now, overlapping concentrations are not obvious. They are presumed obvious for a reason. They're presumed obvious because a range creates a motivation to experiment within the range. The range is 1 to 10. It provides a motivation for an artisan to find the optimal and maybe come up with 4 to 7. Whatever. The case law, however, is that where the ranges are large, and here they are 2 and 3 orders of magnitude, each one, and there are many, 17 or 50 or 80, to find, to optimize, Dr. Glackin testified, that you would experiment with high, middle, and low in those ranges. Those three choices. So you have three choices to the 17th power or the 50th power or the 80th power. You're talking about trillions of experiments. That's not routine optimization. So that's the third error. There's no motivation. In that circumstance, this court's case law says, you need a reason to modify the concentrations. So there's no reason to modify the concentrations, no reason to zero in on the iron chelate in particular, no reason to replace the iron chelate with FAC, no reason to experiment with GSK. That's basically our case. And I think, given the time, I'll sit down. I have one question. What about the prior art, the district court at 102, J.A. 102 cited prior art that taught that FAC was, quote, preferred. You still think there's a genuine issue of fact in that circumstance? I do. When we cite cases in our brief, if you're going to look at the art, you can't look at just one statement in the art. This particular statement is one sentence in a reference. In contrast, there is longer, you know, more. The only art that shows actual experiments is Keenan, which the district court discussed at length. And those experiments say it's not preferred. So where you have a mixed bag, let's look at it in the most favorable light to the ruling against us. There's a mixed bag in the art. Our expert says it's inferior. The district court doesn't disagree that that's a legitimate opinion. And, you know, that's reason enough to conclude it's not desirable in the light most favorable to us on summary judgment. I'll restore you to three minutes. Thank you. May it please the court. Jim Hurst on behalf of Celtron and others. And you're reserving three. Yes, I am. Thank you, Your Honor. We think ensnarement follows from block letter law laid down by KSR. KSR held that a court must ask whether the improvement, and here there's no alleged improvement. Claimed media is not alleged to be better than GSK or Life Tax. And to go on. Whether the improvement, quote, is more than the predictable use of prior art elements according to their established functions. It's similarly held when the prior art is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result. Here that controls because although they used alternative chemical forms for a handful of ingredients, both GSK and Life Tax deliver to the cells the exact same 52 ingredients as the claimed media. Exact same. Same food. Overlapping concentrations. Your Honor, I have a strange fascination with ferric ammonium citrate. Okay. On page 53 of the blue brief, Janssen says, quote, the art provided no affirmative motivation to use the, quote, inferior FAC as a transferring replacement, which undoubtedly explains why FAC was not included in the formula of any publicly available cell culture media before the 083 inventors demonstrated its efficiency. Is that true? That is not true, Your Honor. That's incorrect. Okay. Tell me about it. So Kenan is a 1996 reference that works with one particular cell line. It's called the MDCK cell line. And what Kenan showed is that FAC did what it's supposed to do. It delivered iron to the cells to help them grow. So it was adequate. But Kenan said there were others that were better and therefore preferred. But critically, what Kenan also said was that it should be noted that the effectiveness of any of these factors will depend not only on the cell line, meaning look at other cell lines, do some tests with other cell lines, and maybe you'll get a different order of preference on these iron supplying ingredients. And it also says, it notes, for example, it talks about FAC. For example, Medcalf et al., 1994, found that a combination of SNP and FAC could supply high levels of growth in static culture but not in suspension. The patent here covers both static culture and suspension. So they're telling you it works well in other circumstances. But critically, there's no argument that this means a teaching away type of showing, which requires you to prove that hosts are disregarding it. It's out to pasture. No one's using it anymore. Two things. A 2003, a later now, piece of prior art, called FAC a preferred source of delivering iron. Moreover, the vendor for the media that we bought, the vendor had it in its commercial product starting in 2001. So folks out there were using FAC. So clearly it's not a teaching away case. The main argument, look. Does this substitution-based argument, based on the two passages from KSR that you mentioned, make it immaterial whether there is a triable issue of fact about the starting point? I think the answer to that is yes, because you're looking at a piece of prior art, and you look at this prior art, and anyone who reads the prior art will fully understand that when they list an ingredient, interchangeable ingredients can be used instead. So they're making an utterly trivial, that's Jansen's words by the way, they said making substitutions from one interchangeable ingredient to another. Jansen below, for its infringement serial theory, said that's utterly trivial. That's what they said. So just anyone reading those pieces of prior art would know that they don't just encompass just those ingredients, but also the known alternatives. And Jansen, by the way, has admitted, other than FAC, in a blue book, page 50, note 4 I believe, let me make sure I get that, note 5, they admitted that every ingredient we're talking about for differences are interchangeable with the LIFETEC and GSK ingredients. So there's no dispute that they're just interchangeable. But maybe if I, to make sure that I understand your question, think about how... Well, there was a large dispute, and it was some substantial portion of the district court's analysis about whether there had to be a showing like... Like a lead compound case? Of a reason to pick out the particular portrait on the wall. And assuming that the law is, at least now, and since Kimberly-Clark, yes, there does have to be a reason, then there seems to be some testimony from, was it Dr. Clackson? Clacken, yeah. What's his name? Clark. Yes, Clacken, that they cite that they say creates a tribal issue of fact about whether the starting point for the obviousness analysis was not what your starting point was. And I'm not sure whether the interchangeability piece of KSR means it doesn't really matter. Well, what I would say about that is there's not just one starting point. What they're doing is they are taking out of context Dr. Clacken's testimony. What he's talking about is in the laboratory, when you were going to make a new, brand new media, you use something that's available commercially. GSK and LifeTech were not available commercially. But think of the consequences to the argument that they're making, Your Honor. If what they said is true, the consequences would be truly absurd. Scientists could make utterly routine modifications to existing prior art and then argue that it's patentable because that piece of prior art is not the right starting point. And another, along the same lines, the more crowded the art, the more difficult it would be to show obviousness. Because if there's a lot of pertinent, relevant art, how would you show that one in particular is the right starting point? It's just not sensible. But also, Your Honor, the district court also had an alternative ruling. The district court held that even if he was required to show that LifeTech and GSK were the right starting points, he said they were. They were appropriate starting points. Because GSK and LifeTech solved the problem that the claimed media allegedly solved. He held on. It's A49 to 50, note 4. He held that they already solved the problem. Serum-free media that worked to grow two particular cells. And at least for those particular cell lines covered by the patent here, at least for those particular cell lines, MRC and Vero, clearly GSK and LifeTech would be an appropriate starting point. Because they were proven to work in an animal-free serum on those two cell lines. And also, there's support in the record for that as well. And you're arguing this as a matter of law, right? I am. I am. Because there's no dispute that there was no contrary testimony to what Dr. Glackin explained. And that the court found that if somebody wanted to make a cell line that grew these particular cells, it's certainly an appropriate starting point to look at LifeTech and GSK. That was the district court's finding. There's no contrary testimony from the expert on the other side. Our expert at A3437 and at A1094 explained that if you want to, there's no right answer. In the lab, you need to go to commercial embodiments. But he said if you find art that grows the cells you're trying to grow, that's a good place to start. Just copy what they did. That's what he explained. That's what the district court found. I want to make sure I save time for standing. I was going to go to the overlapping ranges. This seems pretty straightforward to me. There's many cases that say if there's overlapping ranges, they're presumptively obvious. For instance, this court in Geisler said in that circumstance, you have to show that the claimed range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range. Janssen showed the opposite. They said that their ranges were guidelines, not critical, and that there's a wide range of interchangeable concentrations. That was their DOE theory. So that would be a situation where they can't possibly show that the overlapping ranges are not presumptively obvious. What about factual disputes regarding the weight of copying and secondary considerations? See, that's a legal dispute, not a factual dispute, because what the district court did was credit Janssen's evidence. So on the factual side of things, he said, I looked through the evidence, it's a close call, but I'm going to accept that there was copying here. We disagreed, but that's what he accepted. But then he moved on to the legal issue, because obviousness obviously is a question of law. There's many cases. What he found was the copying evidence is insufficient to overcome the strong case of obviousness based on the other gram factors. That follows a long line of cases. Wires is a good example where this court held copying is one of the secondary considerations, but there were others. Said when the claim to mention, quote, represents no more than the predictable use of prior art elements according to their established functions, as here, secondary considerations are inadequate to establish non-obviousness as a matter of law. It's a legal question. So let me move on to standing briefly. We think the standing issue is pretty straightforward. It's the function of a court to enforce contracts as written and not to make a better contract for either of the parties. Your interpretation of this contract is just absurd, isn't it? I disagree, Your Honor. How could anybody say the employee should assign this to, I don't know, 200 companies? There's pros and cons to the way you write these contracts. There were advantages to the way Jansen wrote it and the literal text, Your Honor. What are they? What are the advantages that would require all 200 companies to be joined in any suit? Well, here's an advantage. The way Jansen is interpreting this contract, that it only applies to Senate court and the direct employer, every single time an employee switched from one entity to another within J&J, they would have to create a brand new contract. They never did that. So it makes it simple in that way. How many times did they switch? This is an enormous company with 200 subsidiaries. I understand. White evidence in the record shows that employees who signed nondisclosure agreements routinely switched among companies. And didn't change their agreements. Right. It is Jansen's burden to prove standing. So this is a common-sense advantage, and they're obviously forward-looking. But you're saying that they have the burden, but you're saying a reason why they want to write it this way, and there's absolutely nothing in the evidence to support your reason why somebody would want to write it this way. Remember, you're writing the contracts as a forward-looking thing. So you're trying to account for things that might happen in the future. So I'm positing one of the reasons why somebody might write it that way. But secondly, when different entities within a one- Is your yellow light on just so you know? Will I get two extra minutes? Let me just continue. You get two extra minutes if we eat up your time. I just thought because Mr. We ate up his time. Okay. So the point is transfer agreements and license agreements. When one entity within a larger company owns a patent, you have to engage in transfer and license agreements to get somebody else that right. There's a disadvantage to that because you have to do that as a free market transaction. It sets the royalty rate for your patent. But the bottom line is there is no law in New Jersey allowing courts to rewrite contracts. And that's what this is. The district court's reading of this provision has two key problems. One is that definition applies throughout the contract. And the district court said the definition, the defined term in the contract, has one meaning for patent assignments and a different meaning for confidentiality and non-competes. There's nothing in the contract suggesting that. Number two, for patent assignments but not for confidentiality and non-competes, the district court's reinterpretation really is a rewrite. X is out. Red lines. Every word after the word Senecor. Every word. That is a rewrite. And nothing in the law allows for that. What New Jersey law says is when you're construing a contract, even if you deem it ambiguous, the job is to stay faithfully to the text. You have to decide between reasonable alternative interpretations and only for the purpose of interpreting the writing. You are not supposed to rewrite the contract to create an intention that's not expressed in the writing. So it has to be faithful to the actual writing in the contract, and that's something the district court did not do in this case. Thank you, Your Honors. You've got three of the seven you originally asked for. I can do it in three. Let me just be very brief on standing. Basically, there's no disagreement that Jansen and its employees have universally always understood their contract between each other to require them to assign their patents only to Jansen. A third party, Celtrion, is asking this court to interpret this contract in a way contrary to the shared understanding of the signatories to the contract. We have found no case ever in New Jersey law when that kind of argument has succeeded. On ensnarement, a couple of quick points. First, starting point. Their argument is at core that they can pick with hindsight the closest prior art to install your decision in UCB, which is what they cite principally on this point, says you may. It's not necessarily improper, but there has to be a reason. Often there is. Typically there is. You're building a better mousetrap. The prior mousetrap is going to be the closest prior art. But as UCB showed, you know, there the racemic mixture in the prior art contained exactly the enantiomer, closer than our case, exactly the enantiomer that the claimed invention was, and it was rejected by the district court and affirmed by this court because that's not where one or skill on the facts developed in the record would start. Viewed most favorably, yes. You wouldn't start with these references. Can I just ask you again? Sure. And you're more familiar with the exact language of the testimony you're relying on from, is it their expert? Yes, and our expert as well. Oh, and yours, does one of them, at least Dr. Glackin. Glackin, that's their expert? Right, and I guess I was remembering his testimony as going no further than saying one ordinary place to start would be with the basal media, not that there isn't a range of possible starting points, so that wouldn't count against Mr. Hurst's assertion that if there is another starting point that has already solved a particular problem, that's a pretty good one. The answer to that is, and again, first what Glackin said is you look at the commercial media, the classics, and they list a bunch of them which are classics, and they're fundamentally different than a complete media. You have to understand that. A classic is the foundation on which media are built by people who want to make media, and they always add and subtract different ingredients. They need transferrin. They need transferrin replacements or the like. So that's, he says, where you start. You don't necessarily start with a serum-free medium. You saw on a paper somewhere you don't select a serum, a complete serum-free medium. He says, I don't do that. More or less says I've never heard of anyone doing it. The closest he comes to Mr. Hurst's point is something along the lines of it might not be unreasonable to do that, a double negative. And so I think viewed in the light most favorable to us, all he is saying is that's a technically feasible thing, but I've never heard of anyone doing it. And that's what our evidence is as well. So, again, viewed in the light most favorable to us, that's what one does. And there's no evidence of one doing it to others. Okay. Let me make two other quick points then. Interchangeability. Very quick. I'll make them very quick. I even have 39 seconds. Gary, you're over. Oh, I'm sorry. My clock's showing I have time. The interchangeability, Glackin affirmatively says they're not interchangeable. They're not desirable. If you look at page 22 of our yellow brief, it explains why when you've got conflicting evidence, you've got to balance it. And on summary judgment, that's a pretty hard thing to do against us. And lastly, nothing's predictable about this art. Go to Kenan Appendix 1159. The experiments emphasize the importance of assessing the stability of factors in media and their ability to support growth not only through single state. Wrap up, Mr. Diskin. Okay. Go read the sentence. And thank you very much. Oh, it's frozen. For some reason the clock's frozen. Oh, no. I'm sorry. I was trying to understand why I was. Your red light was on, Mr. Diskin. I apologize. In light of that, I gave you two minutes. Well, I came up ready for 30 seconds. The question Your Honor asked about whether there's more than one appropriate starting point and what our expert, whether, I'm sorry, whether our. We have the cross appeal. Oh, I can't address the, Ms. Nairman? Okay. I was going to say testimony. That was it. So in terms of our interpretation of the contract, it does, it has four subparts. It says CENICOR and J&J and successors and future and existing subsidiaries. That's what it says on its face. Ambiguity, if there's ambiguity, it only allows you to interpret those words through a reasonable alternative reading of the words. It's not just what we said. It's also what Janssen attorneys said in court 11 times. 11 times they went to court and construed that definition in its plain, straightforward way, covering what it says, all four of those components. They did it 11 times. And one of those times they literally said that the two plaintiffs, not just the direct employer but also J&J, own all inventions, patentable or not, developed by the defendant while at the plaintiffs. So they're in court taking the same position that we are. But in the end, the district court didn't rely on absurdity because of, I think, the pros and cons of writing the contract in the different ways. He didn't do that. But ambiguity doesn't allow rewrites of contracts. And that's all that is here. There's no New Jersey law that allows you to take a whole paragraph and, because it's now inconvenient to Janssen, redline everything after the word Seneca. If there's no further questions, thank you, Your Honors. Thank you.